IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BECKY L. TIMPE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 13-cv-518-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Becky L. Timpe seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in June, 2010, alleging disability beginning on August 14, 2008.  (Tr. 101).  After holding an evidentiary hearing, ALJ Dina R. Loewy denied the application in a written decision dated December 27, 2011.  (Tr. 101-114).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 121).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issue Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 9.

Plaintiff raises the following point:

1.    The ALJ failed to properly consider the opinions of plaintiff's treating psychiatrist, Dr. Amin, and therapist, David Drevits.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v.***

*Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Ms. Timpe was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **91 S. Ct. 1420, 1427 (1971).**   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the

4

Commissioner.   See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Loewy followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that she was insured for DIB through December 31, 2013.   She found that plaintiff had severe impairments of bipolar disorder II, major depressive disorder, mild degenerative disc disease, osteoarthritis and fibromyalgia.   She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Timpe had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order, with the exception of the medical records at Tr. 998-1007.   Those records reflect treatment which occurred after the ALJ's decision, and were submitted to the Appeals Council in support of plaintiff's request for review.   Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for

5

a finding of reversible error." *Luna v. Shalala*, **22 F3d 687, 689 (7th Cir. 1994).**

The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.  Plaintiff has not raised an issue with respect to her physical impairments.  Therefore, the Court will not summarize that evidence in any detail.

### 1.    Agency Forms

Plaintiff was born in 1958, and was 50 years old on the alleged onset date. (Tr. 243).   She graduated from high school and attended beauty school.   (Tr. 237).

Ms. Timpe had a number of jobs in the fifteen years before she stopped working.   She worked as a hotel desk clerk, cashier, receptionist, administrative assistant, school photographer, territory manager for a hair salon, waitress, bartender, casino dealer, and cosmetologist.   (Tr. 261-269).

Plaintiff submitted a Function Report in September, 2008, in which she stated that she had manic and depressive phases during which it was extremely hard to function.   She was easily irritated and had become aggressive at times. She had been fired from one job for arguing with a supervisor and from another because she could not get along with one of her bosses.   She could not handle stress and had panic attacks.   (Tr. 273-280).

### 2.    Evidentiary Hearing

Ms. Timpe was represented by an attorney at the evidentiary hearing on September 1, 2011.   (Tr. 32).

Ms. Timpe was 53 years old.   She was 5'8" and weighed about 200 pounds.
Her normal weight was about 155 pounds.   She lived with her mother.   (Tr.
37-39).   She last worked in December, 2008.   Her last job was seasonal, selling
See's brand candy in a mall.   Before that, she worked briefly as a hotel clerk, but
she quit.   She worked as a receptionist at a law firm, but was fired because she did
not get along with one of the attorneys.   She worked as a receptionist for a building
management company, but quit because she did not get along with her boss.   (Tr.
39-45).

Plaintiff lived with her mother, who was almost 90 years old.   She drove her
mother to doctors' appointments, cleaned the house and did the grocery shopping.
(Tr. 52-53).

Plaintiff testified that she was unable to work because she had bipolar
disease.   She had mood swings and panic attacks and became very agitated at
times.   It was very stressful for her to try to hold down a job.   (Tr. 53).

The ALJ noted that Dr. Amin's records mentioned marijuana use.   Plaintiff
said that, before she was diagnosed and prescribed medication, she used
marijuana to medicate herself.   (Tr. 59-60).

Plaintiff took Invega, Effexor, Trazodone and Ativan.   She was compliant
with her medications, and testified that her medications had improved her
condition.   (Tr. 68-69).   Even so, she had mood swings.   She described her mood
swings as follows:

> I can go from being really happy and then all of the sudden I can crash and be
> completely depressed. . . . And then it takes awhile to climb back.   I call it
> the hole.   It takes awhile to climb back out of that hole. . . . And then I'll be

7

okay for a little while and then all of the sudden either the mania hits me or I go back down in the hole.

(Tr. 70).   Ms. Timpe testified that these mood swings continued to occur even while she was taking her medications.   (Tr. 70-71).

She also became "real explosive at times" and had difficulty getting along with people.   When she was depressed, she did not do much of anything.   Sometimes, she did not even take a shower.   She became agitated when stressed, no matter what medication she tried.   She had difficulty finishing things, and difficulty focusing and concentrating.   Her medications made her extremely tired, so she took them at night.   In the morning, she felt like she was in a fog.   (Tr. 71-75).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to simple, routine tasks with one to two step instructions.   She was also limited to only occasional interaction with coworkers and supervisors, limited to nonpublic settings, and limited to performing tasks primarily involving things rather than people.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do. Examples of such jobs are cleaner/housekeeper, retail marker and folding machine operator.   (Tr. 80-81).

### 3.   Medical Treatment

Ms. Timpe has suffered from mental health problems for a number of years. She was hospitalized in 1995 for depression with suicidal ideation.   (Tr. 381).   By

8

2004, she had been diagnosed with bipolar disease and was prescribed medications for that condition.   (Tr. 418-420).

Ms. Timpe's primary care physician was Dr. Michael Kirk.   The earliest office note is dated February 16, 2008.   She was taking Paxil and Ativan, but told Dr. Kirk that she could not sleep.   She had slept only 8 hours in the past 10 days. She was "very emotional."   Dr. Kirk added Depakote and referred her to HHS for further psychiatric evaluation and "possible disability referral."   (Tr. 492-493).

Plaintiff was evaluated at Human Support Services on February 25, 2008. She reported that she had been diagnosed with bipolar disorder in 2004.   She said she experienced manic and depressive episodes with acute insomnia.   It was noted that she did not maintain employment and frequently changed jobs.   "Her work performance goes from all-time consuming devotion to conflict and job loss." Counseling and medication management services were recommended.   (Tr. 515-520).   Ms. Timpe received counselling services from David Drevits, MSW, LCWS, QMHP, through Human Support Services.

Dr. Hetal Amin, a psychiatrist, saw plaintiff through Human Support Services.   He first evaluated her in May, 2008, and concluded that she had a history of bipolar disease II.   He changed her medications.   (Tr. 530-532).

August 14, 2008, is the alleged date of onset of disability.   On that date, Ms. Timpe reported to Dr. Amin that she had been working as a motel front desk clerk, which was "very hard and stressful."   She had a partial relapse in major depressive disorder symptoms, which she felt was caused by the job.   She intended to quit work.   Her mood was euphoric and her speech was rapid.   Dr. Amin changed her

medications.   (Tr. 535-536).   On August 27, 2008, Mr. Drevits noted that she was having increased sleep difficulties and flatness of mood related to her inability to maintain her recent job.   (Tr. 677).

Dr. Amin continued to see Ms. Timpe at regular intervals through the date of the ALJ's decision.   His notes, along with Mr. Drevits' notes, reflect waxing and waning symptoms of bipolar disorder II.[3]   For instance, in January, 2009, she reported to Dr. Amin that she had a "nice" Christmas holiday.   She had worked part-time in a seasonal position.   However, she had also noticed "partial moodswings" with all hypomanic symptoms.   He increased the dosage of Abilify. (Tr. 602-603).   At the next two visits, she reported increasing hypomanic symptoms.   On exam, she had mild psychomotor agitation, her mood was euphoric and her speech was rapid and mildly pressured.   Dr. Amin adjusted her medications.   (Tr. 604-605, 606-607). In May, 2009, Mr. Drevits noted that she was anxious and exhibiting "some avoidance of preparing."   She was fearful that she would become manic, not pay her bills and lose her housing.   (Tr. 706).   On a visit with Mr. Drevits in June, 2009, she was hyper and fidgety, and reported that she had two "angry episodes."   (Tr. 710).   In July, 2009, her mood was slightly elevated and she had gone on a spending spree at Walmart.   (Tr. 713).

On November 19, 2009, Mr. Drevits noted that plaintiff was agitated and pulling at her hair.   (Tr. 733).   On November 25, 2009, she had low energy and a

---

[3] According to the National Institute of Mental Health, "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out daily tasks."   Bipolar disorder II is "defined by a pattern of depressive episodes and hypomanic episodes, but no full-blown manic or mixed episodes."   See, http://www.nimh.nih.gov/health/publications/bipolar-disorder-in-adults/index.shtml, accessed on July 16, 2014.

sad affect.   Mr. Drevits noted that she was obsessively straightening papers on a table, fiddling with her zipper and checking in her pockets.   (Tr. 735).   In December, 2009, she told Dr. Amin that she had been depressed and had started using marijuana to help herself feel better.   He increased the dosage of Effexor.   (Tr. 610-611).

In January, 2010, Ms. Timpe reported to Dr. Amin that she had a "nice" holiday.   She also reported that she made a lot of cookies, "ate all of them," and gained six pounds.   (Tr. 612-613).

Mr. Drevits performed a comprehensive mental health assessment in February, 2010.   The lengthy assessment report concluded that her "primary difficulties result from her mood swings.   She can function well at times but then in [m]anic and depressive episodes her problem solving skills, coping skills and judgment deteriorate."   (Tr. 633).

In February, 2010, she called Mr. Drevits and reported that she had a four day increase in depression and some suicidal ideation.   (Tr. 745).   In June, 2010, she was anxious and worried about her future.   Her mood was stable, but she had low energy.   (Tr. 769).

Plaintiff saw Dr. Kirk in July, 2010.   She had been seen in the emergency room for an anxiety attack.   He noted that her bipolar symptoms had been stable on her current medications until her brother's death.   He refilled her Ativan.   (Tr. 791-792).   She then saw Dr. Amin in August, 2010.   She reported on-going anxiety.   She had gotten Ativan from her primary care physician, but only took it once in a while.   On exam, she had no psychomotor agitation.   Her hygiene was

good.   Her mood was anxious.   (Tr. 814).

On two visits with Mr. Drevits in August, 2010, Ms. Timpe was tired and disheveled.   She shuffled when she walked.   Her affect was flat and her mood was "more depressed."   (Tr. 881-882).   On September 30, 2010, she was disheveled and tired.   She was agitated and rubbing/scratching her scalp.   (Tr. 890).

In October, 2010, plaintiff presented to Mr. Drevits "in nice clothes but her hair was disheveled and eyes reddish."   She rocked as she sat in a chair.   Her affect was sad with an occasional smile.   (Tr. 891).   Two weeks later, she was "coming out of a more depressed episode."   (Tr. 892).

On January 6, 2011, Dr. Amin noted that, since he had reduced her dosage of Invega, she had a partial relapse in in hypomanic signs and symptoms.   She was cleaning a lot, shopping, baking and visiting friends and family more than usual. She felt that she had "accomplished a lot" and did not want to increase her medications.   On exam, she had mild psychomotor agitation and her speech was rapid and somewhat pressured.   Her mood was happy and her hygiene and eye contact were good.   He reduced the dosage of Effexor due to partial relapse in hypomanic signs and symptoms.   (Tr. 863-864).   The next day, Mr. Drevits noted that she had "an elevated mood, smiling frequently, very verbal with high energy." (Tr. 897).   On January 18, 2011, Mr. Drevits noted that Ms. Timpe had "discontinue medication because she was feeling so good."   She was disheveled with her hair askew.   She reported sleeping excessively and said she "did not care if she lived or died."   (Tr. 899).   On January 25, 2011, Mr. Drevits noted that Ms. Timpe had pulled out some of her hair.   (Tr. 900).

12

On February 24, 2011, Dr. Amin noted good eye contact and happy mood. Her speech was rapid and somewhat pressured. She had mild psychomotor agitation while sitting. She had fewer mood swings and hypomanic signs and symptoms since her dosage of Effexor had been reduced, but she was "still not up to baseline." (Tr. 865). She continued to improve. In March, 2011. Dr. Amin noted that, since increasing the dosage of Invega, she felt calmer and had better control over her moodswings. (Tr. 935). On March 30, 2011, Mr. Drevits noted that plaintiff "has not been able to maintain a job without anxious manic episodes leading to loss of job." (Tr. 942). In April, 2011, Mr. Drevits observed that plaintiff "was tired and disheveled after a time of elevated mood. . . ." (Tr. 947). In May, 2011, she was "dressed up today with more energy." Mr. Drevits observed that she was "having a period of elevated mood and energy." (Tr. 948).

In June, 2011, Dr. Amin noted that she "talks at a length of time about a new carmel [sic] chocolate that she has been eating, about hot weather and wanting to work more in her backyard." (Tr. 937). In August, 2011, according to Mr. Drevits, she was frustrated "with recent depressive episode following a time of elevated mood." She reported recent suicidal thoughts. She also returned clothing she had bought on a "spending spree." (Tr. 961). At the next session, she had "an improved mood after period of severe depression with suicidal ideation." (Tr. 962).

### 4.   Opinions of Dr. Amin and Mr. Drevits

In August, 2011, Dr. Amin filled out a form entitled "Assessment for Social Security Disability Claim." He indicated that her diagnosis was bipolar disorder II

13

with mood swings.   Her symptoms included episodes of depression with low energy and fatigue.   She had "times of suicidal ideation."   She also had "times of mania" with insomnia, anxiety, panic attacks and "excessive shopping."   She was compliant with prescribed medications.   Dr. Amin said that her mood swings were not due to substance abuse.   Lastly, he opined that she was unable to sustain competitive full-time employment.   (Tr. 964).

Mr. Drevits filled out the same form.   He stated that Ms. Timpe had a "long history of mood swings, including depression and manic episodes without sleep." He also stated that she "does not have a substance abuse problem."   He opined that she would not be able to sustain a full-time job, and observed that she "presents well and appears to function well, initially, but w/ [with] anxiety + stress her symptoms quickly lead to decompensation."   (Tr. 929-930).

**5.    RFC Assessment**

In July, 2010, state agency consultant M.W. DiFonso, PSYD, evaluated plaintiff's mental RFC based upon a review of the records. She opined that plaintiff had moderate limitations in a number of areas, including ability to understand and remember very short and simple instructions and ability to maintain attention and concentration for extended periods.   Despite these findings, Dr. DiFonso concluded in her narrative remarks that plaintiff's "cognitive and attentional skills are intact. . . . "   (Tr. 807-809).

**<u>Analysis</u>**

The ALJ is required to consider a number of factors in weighing a treating doctor's opinion.   The applicable regulation refers to a treating healthcare provider

14

as a "treating source."   The version of 20 C.F.R. §404.1527(d)(2) in effect at the

time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added][4]

Obviously, the opinions of treating doctors are not necessarily entitled to

controlling weight.   Rather, a treating doctor's medical opinion is entitled to

controlling weight only where it is supported by medical findings and is not

inconsistent with other substantial evidence in the record.   ***Clifford v. Apfel*, 227**

**F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**[5]

If is the function of the ALJ to weigh the medical evidence, applying the factors set

forth in §404.1527.   Supportability and consistency are two important factors to

be considered in weighing medical opinions.   See, 20 C.F.R. §404.1527(d).   In a

nutshell, "[t]he regulations state that an ALJ must give a treating physician's

opinion controlling weight if two conditions are met: (1) the opinion is supported by

---

[4] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

[5] Mr. Drevits is a therapist, and is therefore not considered an "acceptable medical source" whose opinion may be entitled to controlling weight.   See, 20 C.F.R. §§404.1513 & 404.1527.   The ALJ did not, however, rely upon Mr. Drevits' status to discount his opinion, and her decision cannot now be defended on that ground.   ***McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010)**.

'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion**.** ***Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009).** While she is not required to mention every piece of evidence, "he [or she] must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir. 2000)**.

Here, the ALJ gave the opinions of Dr. Amin and Mr. Drevits "neither controlling weight nor much deference" for the general reasons that they were not supported by clinical and laboratory diagnostic techniques and were inconsistent with other substantial medical evidence. She went on to give these specific reasons:

- The opinions are "merely forms completed at the request of the claimant's attorney."

- The opinions are inconsistent with the medical record in that Dr. Amin frequently noted that Ms. Timpe's symptoms improved with treatment.

- The opinions are inconsistent with evidence that Ms. Timpe "kept busy with activities such as traveling, cleaning, caring for her dog and helping her mother.

Tr. 112.

The reasons given by the ALJ are insufficient and not supported by the record.

16

The first reason given by the ALJ was error.   "[T]he fact that relevant evidence has been solicited by the claimant or her representative is not a sufficient justification to belittle or ignore that evidence."   **Punzio v. Astrue, 630 F.3d 704, 712-713 (7th Cir. 2011)**.   The second and third reasons were based on a skewed version of the medical records and an apparent misunderstanding of the nature of plaintiff's disease.

The ALJ set forth a highly selective view of the medical records.   She cherry-picked the positive remarks, and glossed over entries that demonstrated the severity of plaintiff's mood swings.   To start with, ALJ Loewy pointed out that, on August 14, 2008, Dr. Amin described plaintiff's mood as "euphoric."   The ALJ characterized this as a "normal" mood.   See, Tr. 108.   However, the term for a normal mood is "euthymic."   See. http://medical-dictionary.thefreedictionary.com /euthymic, accessed on July 17, 2014.   A euphoric mood, on the other hand, is one of the signs and symptoms of the manic or hypomanic phase of bipolar disorder.   See, http://www.mayoclinic.org/diseases-conditions/bipolar-disorder /basics /symptoms/con-20027544, accessed on July 17, 2014.

The ALJ repeatedly highlighted positive remarks in the medical records, such as plaintiff was doing "well" or "okay," she was alert and oriented, had no psychomotor agitation, had good eye contact, and had no side effects from her medications.   (Tr. 108-111).   It is evident from the detailed review of the medical records set forth above that there were entries in the medical records that support the opinions of Dr. Amin and Mr. Drevits.   The ALJ failed to mention those entries.   A few examples will suffice to illustrate this point.

17

ALJ Loewy noted that plaintiff told Dr. Amin in January, 2009, that she had a nice Christmas with her family, but failed to note that plaintiff also said she had been having partial moodswings with all hypomanic signs and symptoms for the past month.   (Tr. 602).   The ALJ noted that plaintiff told Dr. Amin that she was "doing okay" on April 2, 2009, but failed to mention that Dr. Amin described her as hyper with mild psychomotor agitation, a euphoric mood, and rapid and mildly pressured speech.   (Tr. 604).   Similarly, the ALJ pointed out that, in January, 2010, plaintiff told Dr. Amin that "she had a nice holiday and made many cookies." In fact, Ms. Timpe told Dr. Amin that, while she did have a "nice" holiday, she had eaten all of the cookies that she had made and had gained six pounds.   (Tr. 612). The ALJ failed to mention that, in October, 2010, Mr. Drevits observed that plaintiff's hair was "disheveled," her eyes were reddish, she rocked as she sat in a chair, and she had a sad affect.   (Tr. 891).

Perhaps most tellingly, the ALJ completely failed to reference the fact that Ms. Timpe experienced a hypomanic phase in January, 2011, during which she stopped taking her medication because she felt so well.   She then entered a depressed phase.   She appeared for a session with Mr. Drevits on January 18, 2011, in a disheveled state and reported that she was sleeping excessively and "did not care if she lived or died."   A week later, Mr. Drevits observed that Ms. Timpe had pulled out some of her own hair.   (Tr. 899-900).

Further, the ALJ apparently found it significant that Ms. Timpe kept busy with a number of activities.   The ALJ failed to recognize that these periods of increased activity, including shopping sprees, coincided with hypomanic phases.

18

Dr. Amin specifically noted that excessive shopping was one of the symptoms of plaintiff's hypomanic phases.

In addition, the ALJ failed to mention Dr. DiFonso's RFC assessment at all. Dr. DiFonso indicated that Ms. Timpe was moderately limited in ability to understand and remember very short and simple instructions, ability to maintain attention and concentration for extended periods, ability to get along with coworkers, ability to accept instruction and respond to criticism from supervisors, and ability to maintain socially appropriate behavior and adhere to basic standards of cleanliness.  (Tr. 807-809).  Dr. DiFonso's evaluation lends some support to the opinions of Dr. Amin and Mr. Drevits.

The Seventh Circuit has "often observed that bipolar disorder . . .  is by nature episodic and admits to regular fluctuations even under proper treatment." ***Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011)**, and cases cited therein. Because the symptoms of bipolar disorder wax and wane, "a snapshot of any single moment says little about [plaintiff's] overall condition."  ***Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).**  The Seventh Circuit has also observed that "many of the Social Security Administration's administrative law judges seem poorly informed about mental illness." ***Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010).**  That appears to be the case here.  The fact that Ms. Timpe had episodic improvement in her symptoms with treatment does not contradict the opinions of Dr. Amin and Mr. Drevits.   And, the ALJ seems not to have considered the relationship between the hypomanic phase of Ms. Timpe's disease and her periods of increased activity.

19

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." ***Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)**.   This rule is long-standing.   See, ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)**, and cases cited therein.   The ALJ's highly selective review of the medical evidence undermines her weighing of the medical opinions and her ultimate findings as to plaintiff's RFC.   See, ***Moore*, 743 F.3d at 1122-1127**.

The ALJ is "required to build a logical bridge from the evidence to her conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009)**.   ALJ Loewy simply failed to do so here.   She erred in presenting only a "skewed version of the evidence." ***Moore*, 743 F.3d at 1123**.   As a result, her decision is lacking in evidentiary support and must be remanded. ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)**.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Timpe is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying 's Becky L. Timpe's application for social security disability benefits is **REVERSED** and **REMANDED** to the

Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:      July 18, 2014.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**